

# AGREEMENT BETWEEN THE UNITED STATES AND THE SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE

### i.  INTRODUCTION

1. This matter involves security, safety, and the use of isolation at the South Carolina Department of Juvenile Justice's ("DJJ") Broad River Road Complex ("BRRC" or "the Facility"), a long-term residential facility for youth committed to the juvenile justice system in South Carolina.

2. In 2017, the United States Department of Justice ("DOJ") initiated an investigation of conditions at BRRC pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601. The investigation assessed whether DJJ failed to protect youth from physical abuse by other youth and by staff and whether DJJ subjected youth to prolonged solitary confinement.

3. Throughout the investigation, DJJ's leadership and staff fully cooperated with DOJ, providing access to youth, staff, documents, and other necessary material. DJJ provided DOJ and its consultants full access to the facility, and DJJ was receptive to the on-site recommendations of DOJ and its consultants. DJJ also began to implement improvements even while the investigation remained pending.

4. In February 2020 and April 2022, DOJ issued Notices concluding that there is reasonable cause to believe that certain conditions at BRRC violated the constitutional rights of youth at BRRC.

5. DJJ has demonstrated significant commitment to reforming its policies and processes and continues to work diligently to address concerns identified by DOJ. Among the steps that DJJ has already taken are to lower staff-to-youth ratios, reduce blind spots in housing units, inplement cool down rooms to reduce use of isolation, develop an electronic portal for the entry and subsequent processing of Use of Physical Force forms, and hire additional investigations staff.

6. In order to resolve all issues pending between the Parties without the expense, risks, delays, and uncertainties of litigation, the Parties agree to the terms of this Settlement Agreement as stated below. As a result of DJJ's voluntary cooperation and willingness to implement meaningful change, the Parties believe this Settlement Agreement, rather than contested litigation, represents the best opportunity to address DOJ's findings.

7. The purpose of this Settlement Agreement ("Settlement Agreement" or "Agreement") is to remedy the alleged constitutional violations identified by DOJ. Through the provisions of this Agreement, the Parties seek to ensure that the conditions in the Facility support the rights of youth confined there, encourage rehabilitation, and improve the likelihood that youth will succeed upon release. By ensuring that the conditions in BRRC comply with the applicable

requirements of the United States Constitution, South Carolina will also provide for the safety of staff and the public.

8. The Parties to this Agreement are the United States, represented by DOJ, and DJJ.

9. For purposes of this Agreement only and in order to settle this matter, the Parties stipulate that this Agreement complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a) ("PLRA"). The Parties stipulate and agree that all of the prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations identified by the United States, and is the least intrusive means necessary to correct those violations.

10. This Agreement shall constitute the entire integrated agreement of the Parties. No prior contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions here in this litigation or in any other proceeding.

## ii.     DEFINITIONS

11. "Broad River Road Complex" or "BRRC" refers to the secure facilities used for long-term commitment of youth in the South Carolina juvenile justice system. The term also includes any new construction, contracted facilities, leased facilities, renovated facilities, or other secure replacement facilities used for long-term commitment of youth by the South Carolina juvenile justice system.

12. "Days" are measured in calendar days. Saturdays, Sundays, and holidays are included, unless expressly referred to as "Business Days."

13. "Department of Juvenile Justice" or "DJJ" means the South Carolina Department of Juvenile Justice.

14. "Effective Date" means the date the Parties sign this Agreement.

15. "Isolation" means the placement of a youth alone in a cell, room, or other area where the youth is unable to leave, excluding during sleeping hours for youth housed in their own room.

16. "Multidisciplinary Team" means a group of representatives from BRRC's mental health, medical, and security departments who review the placement of youth in isolation and ensure that the placement complies with policies, the youth receives access to appropriate services, and the facility has a plan to return the youth to the general population or to an appropriate placement.

17. "Qualified Medical Professional" means a licensed physician, licensed physician assistant, licensed nurse practitioner, or a registered nurse who is, at the relevant time, employed/contracted by DJJ and currently licensed by the State of South Carolina to deliver those health care services he or she has undertaken to provide.

2

18. "Qualified Mental Health Professional" means an individual employed/contracted by DJJ who has the education, experience, training, credentialing, and licensing required to provide mental health services.  The Qualified Mental Health Professional must be either a doctorate-level psychologist, psychiatrist, master's level clinical social worker or counselor, licensed professional counselor, or similarly credentialed personnel.

19. "Reasonable Efforts" means diligent and good faith actions to accomplish the applicable objective.

20. "Restraint" means the use of mechanical restraints (e.g., handcuffs, belly chains, leg shackles) to restrict or limit a youth's freedom of movement. The term "restraint" does not include the routine use of mechanical restraints for transport or movement to appointments, court, and other off-campus locations.

21. "Serious and Immediate Danger" means a present action engaged in by a youth that has a high likelihood of resulting in serious harm or injury to the youth or to others.

22. "Specialized Housing" means a separate unit or units designated for youth who are screened during classification, or at any time thereafter, as being vulnerable to victimization or in need of protection from assault.

23. "Staff" means all individuals employed by DJJ at the BRRC.

24. "Subject Matter Expert" is an individual with expertise in juvenile corrections who is chosen by the Parties to provide technical assistance to DJJ and to assess compliance with this agreement.

25. "Train" means to instruct in skills to a level that the trainee has demonstrated proficiency by testing to implement those skills as and when called for.  "Trained" means proficient in the skills.

26. "Use of force" means the application of physical measures to compel compliance by an unwilling youth, including a physical restraint.  For purposes of paragraphs 56–66 of this Agreement, "use of force" also includes unauthorized physical measures such as punching, kicking, and choking.

27. "Youth" means one or more individuals detained at, or otherwise housed, in the custody of, or confined at BRRC.

iii.     SUBSTANTIVE PROVISIONS

**PROTECTION FROM HARM**

28. DJJ shall, at all times, provide youth at BRRC with safe living conditions by: ensuring that there is sufficient staffing to implement the provisions of this agreement; using surveillance tools to prevent violence and promote accountability; providing structured programming

designed to engage youth in rehabilitative activities; implementing positive behavior supports to encourage appropriate behavior; instituting clear, consistent, appropriate consequences for negative behaviors; and limiting uses of force and restraints to incidents where the youth poses a serious and immediate danger and after other efforts to de-escalate the youth's behavior have failed.

29. **Staffing:** DJJ will hire a consultant to conduct a staffing study within nine months of the effective date. The staffing study will determine the appropriate staffing levels and patterns to implement the terms of this agreement, including adequately supervising youth in the male living units.

30. The DJJ and the DOJ will jointly select the consultant who conducts the staffing study.

31. The staffing study will consider factors including:
    i. The classification and risk profiles of youth at BRRC;
    ii. The physical configuration and function of spaces;
    iii. When and where incidents reported in BRRC's incident management system most frequently occur at BRRC; and
    iv. The routine availability of staff, including supervising officers, and DJJ public safety officers to respond to incidents.

32. Within 18 months of receiving the staffing study, DJJ will make reasonable efforts to implement changes to existing staffing to conform to the staffing patterns recommended by the staffing study.

33. **Physical Plant**: Within three months of the effective date of this Agreement, DJJ will identify areas within BRRC where there is currently no video surveillance, and where incidents have occurred in the last year, or are likely to occur.

34. Within five months of the effective date of this Agreement, DJJ will propose to the United States and the Subject Matter Expert a timeline for adding surveillance tools to enable: (1) effective supervision of areas without video surveillance; and (2) effective investigations of incidents occurring in areas without video surveillance. When developing this timeline, DJJ will prioritize blind spots where incidents have occurred in the last year.

35. The United States and the Subject Matter Expert will review the proposed timeline, and proposed placement of surveillance tools, and propose any revisions necessary within one month of receiving the proposal. The final timeline is subject to approval by the United States.

36. Once approved by the US, DJJ will add surveillance according to the approved timeline.

37. DJJ will retain all video surveillance for a sufficient period to ensure it is available for investigations, regular oversight, and quality assurance reviews.

38. **Rehabilitative Programming:** DJJ will provide adequate, structured rehabilitative programming, from the end of the school day until youth go to bed and on weekends, to reduce the likelihood of youth-on-youth violence.

39. Rehabilitative programming will include an appropriate mix of physical, recreational, and leisure activities. The programming will be designed to support positive behavior, engage youth in constructive physical activity, address general health and mental health needs, and be coordinated with youth's individual behavioral and treatment plans.

40. **Approach to Behavior Management:** Within six months of the effective date, DJJ will retain consultants to assist in establishing a positive behavior management program and provide BRRC staff with regular on-site coaching for at least two years. In seeking out consultants, DJJ will prioritize individuals who have experience in implementing behavior management systems while reducing uses of force and lessening the unnecessary use of isolation. DJJ and the DOJ will jointly select the consultants.

41. Within twelve months of the effective date, DJJ will establish positive behavior management tools to encourage compliance with facility rules by providing positive incentives, including both short- and long-term incentives. These tools shall be reviewed and approved by the Subject Matter Expert.

42. DJJ will consistently implement the established positive behavior management tools to reduce youth-on-youth violence.

43. DJJ will provide staff with de-escalation strategies and a graduated array of responses and sanctions, other than use of physical force or isolation, to employ when positive behavior management tools are unsuccessful.

44. DJJ and the behavior management consultants will identify DJJ staff members who are consistently able to successfully de-escalate youth conflicts and implement appropriate discipline. These staff members will serve as on-site coaches for colleagues and mentors on the use of behavior management.

45. **Use of Force:** Within nine months of the effective date, DJJ, with the help of consultants, will revise its policies and procedures governing use of force and restraints, and provide the revised policies and procedures to the Subject Matter Expert and the United States for approval. The United States and the Subject Matter Expert will review the proposed policies and procedures and propose any revisions necessary within one month of receiving the proposal.

46. Within 18 months of the effective date, DJJ will implement the revised use of force policies and procedures.

47. Staff will limit uses of force or restraints to exceptional situations where a youth is currently physically violent and poses an immediate danger to self or others.

48. Prior to using force or restraints, staff will make reasonable efforts to attempt and to exhaust a graduated set of interventions that avoid or minimize the use of force.

49. In situations where uses of force or restraints are necessary, staff will use force for the minimum amount of time necessary to stabilize the situation. As soon as the youth regains self-control and the immediate situation is safe for the youth and others, staff will temper their use of force and stop using restraints with respect to the youth involved.

50. Staff will not use force or restraints as punishment or in retaliation for disobedience or the youth's failure to follow a verbal command.

51. Only staff specifically trained in the application of force are permitted to use such techniques and trained staff may only use techniques approved by policy and consistent with training.

52. DJJ will ensure that Staff promptly document and report all uses of force and restraints, to include:
    i. A description of the youth action that created a serious and immediate danger to self or others necessitating the use of force or restraint;
    ii. A description of verbal directives and graduated interventions that were attempted to avoid or minimize the use of force or restraints; and
    iii. The type of force or restraint used, including naming the specific techniques on which officers are trained, and for how long it was used.

53. After an instance of use of force or restraint, DJJ will ensure that youth are evaluated promptly by a qualified medical professional or transported to a medical emergency facility promptly, unless the youth refuses a medical evaluation. Except in an exceptional circumstance, the youth should be transported to the qualified medical professional by a staff member who was not involved in the use of force or restraint.

54. The qualified medical professional will examine and question the youth involved in the use of force or restraint outside the hearing of other staff or youth. If, in the course of the youth's examination, a qualified medical professional suspects the inappropriate use of force or restraints, the qualified medical professional will immediately take all appropriate steps to document the matter in the youth's medical record and complete an incident report.

55. If a youth refuses a medical evaluation immediately after the use of force or restraint, staff will document the refusal and report it to the qualified medical professional. Within 12 hours of the use of force or restraint, the qualified medical professional will contact the youth to offer to conduct an evaluation. If the youth consents, or if injuries are visible without conducting an exam, the qualified medical professional will document any injuries. If the youth again refuses and no injuries are visible, the qualified medical professional will document the youth's refusal and any reasons the youth provides for the refusal.

56. **Investigations of physical harm to youth from other youth, excessive or unnecessary use of physical force, or improper use of isolation**: Within nine months of the effective date, DJJ, with assistance from the Subject Matter Expert, will draft modifications to policies,

procedures, and practices concerning investigations of physical harm to youth from other youth, excessive or unnecessary use of physical force, or improper use of isolation. DJJ will provide the revised policies and procedures to the United States and the Subject Matter Expert for approval. The United States and the Subject Matter Expert will review the proposed policies and procedures and propose any revisions necessary within one month of receiving the proposal.

57. Within 18 months of the effective date, DJJ will implement the revised investigation policies and procedures.

58. DJJ will ensure that all uses of force or restraint, allegations of physical harm to youth from other youth, or the improper use of isolation receive an initial review, including review of the incident report, use of force report, and video, if applicable. DJJ will track every use of force or restraint, allegation of youth-on-youth harm, or the improper use of isolation incident that receives an initial review, the outcome of that review, and the basis for that determination.

59. All incidents where: (1) a youth or someone on the youth's behalf files a grievance or an informal complaint of youth-on-youth physical harm from fights or assaults, uses of force or restraint, or the improper use of isolation; or (2) where the initial review described above indicates conduct may be in violation of criminal law (excluding Assault and Battery 3rd degree involving a youth perpetrator) or agency policy will be fully investigated by trained investigators with no involvement or personal interest in the underlying event. A full investigation conducted by a DJJ investigator will be completed within ten business days of the investigator receiving the allegation for investigation. The policies may permit an extension of no more than ten additional business days to complete an investigation where the investigator documents the need for such an extension to complete the steps below. A full investigation must include, but may not be limited to:
    i. Interviews with the alleged victim, the alleged perpetrator, all officers present during the incident, and any other witnesses;
    ii. Review of any documentation that exists, including the incident report, youth's grievance, if applicable, use of force report, and witness statements;
    iii. Review of a video of the incident, if one exists; and
    iv. A written report documenting the investigation and the conclusion(s).

60. If the initial review of a use of force or restraint does not result in a full investigation, the investigator will send all documentation, including the incident report, use of force report, and video, if available, to the impacted Deputy Director(s). The impacted Deputy Director(s) will ensure that the employee's Senior Manager reviews the documentation and video, if available, to evaluate proper techniques and de-escalation efforts. Upon this review, the Senior Manager will provide staff feedback as appropriate to reinforce or correct staff.

61. After an allegation as indicated above is made, DJJ will make a prompt determination about the level of permissible contact between the youth and the alleged perpetrator during the investigation period, in light of the nature of the allegation and the safety of all youth.

62. DJJ will ensure that a video of the incident, if one exists, is requested within three days of receiving the allegation.

63. DJJ will retain all investigation documents, including video and interview notes, for at least one year.

64. If the incident requires a full investigation as described in paragraph 59, the investigation must be completed even where no video exists of the incident.

65. DJJ will take prompt and appropriate corrective and disciplinary measures in response to a finding of staff misconduct arising from the inappropriate use of isolation, the excessive or unnecessary use of physical force, or a failure to protect youth from physical harm by other youth.

66. In cases where a youth withdraws an allegation, states a desire not to prosecute a criminal matter, declines to be interviewed about an allegation, or refuses to write a statement, this will not be used as the sole reason to terminate an investigation. The investigation will also include an effort to determine the reasons for the withdrawal or refusal.

**ISOLATION**

67. **Use of Isolation:** Within nine months of the effective date, DJJ, with assistance of consultants, will revise its isolation policies and procedures to be consistent with the principles set forth in paragraphs 68–94. DJJ will provide the revised policies and procedures to the United States and the Subject Matter Expert for approval. The United States and the Subject Matter Expert will review the proposed policies and procedures and propose any revisions necessary within one month of receiving the proposal.

68. Within 18 months of the effective date, DJJ will implement its revised isolation policies and procedures.

69. Youth will only be isolated when the youth poses a serious and immediate danger to self or others and staff has made reasonable efforts to attempt and exhaust de-escalation strategies.

70. Once DJJ revises its policies and procedures in accord with the schedule set out in this section, staff will not use isolation for discipline, punishment, retaliation, protective custody, suicide intervention, as a temporary living unit for youth who are awaiting transfer to other facilities, or any reason other than as a response to behavior that poses a serious and immediate danger to self or others.

71. Prior to using isolation, staff will utilize less restrictive techniques, such as talking with the youth to de-escalate the situation, removing the youth from other youths with whom he is in conflict, and placing the youth in another housing unit if safe to do so. Only after less restrictive techniques have failed may the facility use isolation.

72. Whenever a youth is isolated, the staff will immediately notify the Facility Administrator or the Assistant Facility Administrator.

73. **Documentation of Isolation:** DJJ will ensure that documentation of isolation identifies with specificity what youth action created a serious and immediate danger to self or others necessitating the use of isolation, and what less restrictive techniques an officer used prior to using isolation.

74. **Duration of Isolation:** Youth will be in isolation only for the time necessary for the youth to regain self-control such that they no longer pose a serious and immediate danger. As soon as the youth's behavior ceases to pose a serious and immediate danger to self or others, or once the multidisciplinary team designates an alternative living unit/placement for the youth, whichever is sooner, staff will promptly return the youth to the general population or other appropriate living unit/placement.

75. During the time that a youth is in isolation, staff will provide intervention and observation. The goal of the intervention is to de-escalate the youth's behavior so that they can rejoin the general population as soon as possible.

76. Youth will not remain in isolation for longer than four hours, except when approved by security leadership in the chain of command from Assistant Facility Administrator to Deputy Director.

77. Within the first 24 hours of isolation, and every day thereafter, a qualified mental health professional must examine the youth in-person and document whether:
    i. The youth poses a serious and immediate danger to self or others;
    ii. The continued use of isolation will be detrimental to the youth's current mental health; and
    iii. Less restrictive measures may help to eliminate the serious and immediate danger to the youth or others.

78. Prior to extending isolation beyond four hours, and every day thereafter, the Assistant Facility Administrator, Facility Administrator, or other security leadership in the chain of command up to Deputy Director must visit the youth in-person, review any completed findings of the Qualified Mental Health Professional, talk to relevant staff, and document whether:
    i. Staff used less restrictive measures prior to using isolation and the effectiveness of those measures; and
    ii. The youth poses a serious and immediate danger to self or others.

79. The conclusions from paragraphs 77–78 must be reported to the Deputy Director or Assistant Deputy Director (or equivalent title within the security leadership chain of command) within the first four hours, and every day thereafter, and approval must be granted to continue isolating the youth.

80. If, after reviewing the documentation, anyone in security leadership in the chain of command from Assistant Facility Administrator to Deputy Director determines that the youth is no longer a serious and immediate danger to self or others, the youth will be immediately removed from isolation and returned to the general population or other appropriate living unit/placement.

81. **Multidisciplinary Team to Review Isolation Placement:** Within eighteen months of the effective date, BRRC will develop a multi-disciplinary team to review placements of youth in isolation.

82. The multidisciplinary team will meet within 48 hours of a youth's placement in isolation to discuss and document:
    i. Whether the youth remains a serious and immediate danger to self or others. If not, the youth will be immediately returned to the general population or other appropriate living unit/placement;
    ii. What services the youth received in the general population, including education and mental health treatment;
    iii. How the youth will continue to receive needed services while in isolation;
    iv. An individualized plan designed to facilitate the youth's return to the general population or to an alternative location (such as alternative housing units or mental health treatment facilities);
        a. The individualized plan will be created in consultation with the youth's family members, when possible; and
        b. The plan will include an anticipated timeline for implementation and the youth's return to the general population.
    v. If the multidisciplinary team believes that a youth may be appropriate to be transferred to a mental health treatment facility, the team will immediately refer the youth to the SMI Special Needs Coordinator for further assessment.

83. The multidisciplinary team will continue to meet every three days while any youth is in isolation to discuss and document:
    i. Whether the youth remains a serious and immediate danger to self or others. If not, the youth will be immediately returned to the general population or other appropriate living unit/placement;
    ii. Implementation of the individualized plan; and
    iii. Any necessary modifications to the individualized plan the multidisciplinary team developed at its previous meeting.

84. The youth's unit team, which includes representatives from the security and mental health departments, will meet monthly to review youth who have been isolated two or more times in the past month or for one stay of more than four hours in the past month. The team will discuss and document:
    i. Whether the youth's mental health and behavioral needs can be met in the facility and, if not, whether a recommendation to the SMI Special Needs Coordinator is appropriate; and
    ii. Interventions that have been attempted to improve the youth's behavior, the success of those measures, and any additional or alternative interventions available to address the youth's needs.

85. **Development of Appropriate Space for Isolation:** Within 6 months of the effective date, DJJ will propose to the United States and the Subject Matter Expert a timeline to cease using

the Laurel Building for youth in isolation and a plan to utilize alternative, safe spaces for isolating youth whose behavior poses a serious and immediate danger to self or others.

86. The United States and the Subject Matter Expert will review the proposed timeline and plan and propose any revisions necessary within one month of receiving the proposal. The final timeline is subject to approval by the United States.

87. **Conditions and Services While in Isolation:** Youth in isolation will receive access to sunlight, working showers and bathrooms, mattresses, and food that is the same quality and quantity as offered to the general population.

88. Within the first school day after a youth is placed in isolation, DJJ will provide meaningful education services delivered by a teacher certified by the State or an associate teacher working under the supervision of a teacher certified by the State. If the youth has not regained enough self-control to receive in-person educational services, representatives from the multidisciplinary team should meet to discuss temporary alternatives to in-person education.

89. **Housing Vulnerable Youth:** Within nine months of the effective date, DJJ will review and revise its housing classification policies for youth who are identified as vulnerable to victimization to ensure youths' reasonable safety.

90. DJJ will revise its admissions screening protocols to identify youth who are vulnerable to victimization by other youth in the facility.

91. Youth who are not screened as vulnerable to victimization upon admission to BRRC, but later become vulnerable to violence from other youth will be considered for placement in specialized housing. Prior to placing a youth under this provision, the facility will consider other measures and options for ensuring safety.

92. Youth in specialized housing will have access to all services, including education, recreation, and mental health services to the same extent as youth in the general population.

93. **Youth on Suicide Watch:** The facility will ensure that youth who are suicidal are not placed in isolation.

94. Within six months of the effective date, DJJ will make reasonable efforts to amend their Agreement with the Department of Mental Health for the Identification and Transfer of DJJ Committed Juveniles Who Have a Serious Mental Illness to ensure that:
    i. The Department of Mental Health identifies placements for youth with serious mental illness to ensure that youth with serious mental illness are transferred to DMH custody within 30 days of their identification as a youth with a serious mental illness; and
    ii. Youth who are suicidal are promptly considered for placement out of DJJ and into DMH custody.

**TRAINING**

95. Within twelve months of the effective date, the Subject Matter Expert will review DJJ's current training curriculum and assist DJJ to develop a training curriculum that complies with the requirements of paragraphs 96–100.

96. **Behavior Management:** Within 18 months of the effective date, and annually thereafter, all security staff and teaching staff will receive competency-based training in non-physical, verbal interventions to de-escalate potential aggression from youth. This training will include conflict management, crisis intervention, and appropriate communication with youth.

97. If an investigation or review of an incident reveals that staff did not use appropriate de-escalation, the staff member will be retrained within 90 days. If an investigation or review of an incident reveals that a staff member who has been retrained continues to fail to use appropriate de-escalation, DJJ will address the staff member's failure through discipline.

98. **Use of Physical Force:** Within 18 months of the effective date, and annually thereafter, all security staff will receive training on the updated Use of Physical Force policy, including training in conflict resolution, management of assaultive behavior, and approved uses of force that minimize the risk of injury to youth and staff. All training shall include each staff member's demonstration of the approved techniques and require that staff meet the minimum standards for competency established by the method.

99. If an investigation or review of an incident reveals that staff used inappropriate or excessive force, the staff member will be retrained within 90 days and will be prohibited from using force until demonstrating proficiency in the proper technique(s). The retraining and competency demonstration must be documented prior to such staff using force again.

100. **Investigation:** Within 18 months of the effective date, and annually thereafter, DJJ will train all investigations staff, including supervisory investigative staff, in the prompt, thorough, and independent investigation of allegations of youth on youth physical harm, inappropriate use of force, and inappropriate use of isolation. DJJ will train the facility administrator and other facility security supervisory staff in the investigation process and the importance of thorough documentation of incidents and video retention.

**QUALITY ASSURANCE**

101. Within 24 months of the effective date, DJJ must develop a quality assurance system that identifies trends and corrects deficiencies with regard to safety and security and the use of isolation at BRRC in a timely manner.

102. On a monthly basis, DJJ will collect, review, and analyze data and information sufficient to assess and identify trends in youth-on-youth physical harm, inappropriate use of force, and inappropriate use of isolation.

103. At a minimum, the data and information collected and analyzed will include:

      i. The number of incidents involving youth-on-youth physical violence;
      ii. The number of incidents involving youth injuries related to assaults/fights or use of force or restraints;
      iii. The number of incidents involving use of force;
      iv. The number of incidents involving restraints;
      v. Injuries to youth related to assaults/fights or use of force or restraints, including the type of injury, the source of the injury, and the severity;
      vi. The positive behavior incentives used at BRRC during the preceding month;
      vii. The consequences imposed on youth for negative behaviors in the preceding month;
      viii. The consequences imposed on staff for improper uses of force or restraints;
      ix. The number of grievances filed alleging harm to youth from youth-on-youth physical altercations, inappropriate use of force, or inappropriate use of isolation;
      x. The number of full investigations as outlined above completed within ten business days;
      xi. The number of full investigations as outlined above completed in more than ten business days;
      xii. The number of open investigations;
      xiii. The number of youth placed in isolation;
      xiv. The number of youth who remained in isolation over four hours;
      xv. The number of youth who remained in isolation over three days;
      xvi. The individual lengths of stay for youth placed in isolation; and
      xvii. The overall average length of stay of all youth placed in isolation.

104. On a monthly basis, DJJ will review a sample of incident reports, isolation justification and continuation documents, and investigations. The review and subsequent recommendations will be documented.

105. The Subject Matter Expert may recommend to DJJ additional information related to youth-on-youth physical altercations, use of force, or isolation that DJJ will consider for collection, review, and analysis on a regular basis.

106. DJJ will develop and implement within 24 months of the effective date a Quality Improvement Committee that will:
      i. Review and analyze the data collected pursuant to paragraphs 103–105;
      ii. Identify trends and interventions,
      iii. Make recommendations for further investigation of identified trends and for corrective action, including system changes;
      iv. Monitor implementation of recommendations and corrective actions; and
      v. Develop systems to alert administrators to patterns of behavior or allegations that may indicate safety concerns, staff training deficiencies, or persistent policy violations.

### iv.     SUBJECT MATTER EXPERT

107. Within 60 days of executing this Agreement, the Parties will jointly select and approve a Subject Matter Expert who will be retained by DJJ to provide select technical assistance to help BRRC comply with its obligations under the Agreement, prepare an assessment of DJJ's compliance with this Agreement, and provide any recommendations to facilitate compliance.

108. The Parties will cooperate fully with the Subject Matter Expert.

109. The Subject Matter Expert will begin their duties as soon as possible upon approval. In the event the Subject Matter Expert resigns or the Parties agree to replace the Subject Matter Expert, the Parties will meet and confer within ten (10) days to agree upon a replacement.

110. The Subject Matter Expert and the United States (and its agents) will have full access to persons, employees, facilities, buildings, programs, services, documents, data, surveillance videos, records, materials, and things that are necessary to provide technical assistance and assess BRRC's progress and implementation efforts with this Agreement. The United States and/or the Subject Matter Expert will provide reasonable notice of any visit or inspection. Advance notice will not be required if the United States has a reasonable belief that a youth faces a risk of serious and immediate harm.

111. In completing his or her responsibilities, the Subject Matter Expert may: (a) hire staff and consultants as necessary and within the limits of the budget approved in paragraph 113; (b) request written reports and data from BRRC; and (c) communicate ex parte with a Party, counsel, agents, or staff of a Party, the Court, or anyone else the Subject Matter Expert deems necessary for providing technical assistance.

112. The Subject Matter Expert, or any staff or consultants he or she may hire, shall not duplicate the technical assistance provided by the consultants retained pursuant to the Agreement. However, the Subject Matter Expert may hire any staff or consultants should she determine that additional technical assistance is necessary for DJJ to comply with the Agreement.

113. DJJ will provide the Subject Matter Expert with a budget sufficient to allow the Subject Matter Expert to assess compliance and provide technical assistance as described in this Agreement. Annually, the Subject Matter Expert will prepare and submit a detailed budget to DJJ for its approval. This budget shall not exceed $225,000 in the first year. The Subject Matter Expert shall explain, in writing, the need for any increase to the budget in subsequent years. Any such increase shall be reasonable and proportionate to the described need.

114. The cost of the Subject Matter Expert, including the cost of any staff or consultants to the Expert, will be borne by DJJ, but the Subject Matter Expert and his or her staff or consultants are not agents of DJJ. All reasonable expenses incurred by the Subject Matter Expert or any of his or her staff in the course of the performance of the duties of the Subject Matter Expert will be reimbursed by DJJ consistent with the budget.

115. The Subject Matter Expert will not enter into any additional contract with the United States or DJJ while serving as the Subject Matter Expert without providing notification and receiving the consent of both parties.

116. At least every six months, beginning six months after the effective date and continuing until the Agreement terminates, the Subject Matter Expert will draft and submit to the Parties a comprehensive report on DJJ's compliance.  The report will rate DJJ's progress, indicating where DJJ has achieved substantial or partial compliance, and where DJJ is in noncompliance with the terms of the agreement.  The report will also include recommendations, if any, to facilitate or sustain compliance.

117. The Subject Matter Expert will consult with DJJ and the United States in drafting its report. The Parties will have two weeks to provide comments to each draft Compliance Report.  The Subject Matter Expert will consider these comments and provide a final Compliance Report a week prior to the meeting referenced below in paragraphs 121 and 122.  DJJ will post these final reports on its website.

118. If the Subject Matter Expert resigns from his or her position as Subject Matter Expert, he or she may not enter any contract with DJJ or the United States on a matter related to this Agreement without the written consent of the other Party while this Agreement remains in effect.

### v.     IMPLEMENTATION

119. The Parties agree that Wendy Leach will be the Director of Settlement Compliance retained by DJJ to coordinate compliance with this Agreement and to serve as a point of contact for the Parties and the Subject Matter Expert.

120. DJJ will create an annual Implementation Plan that describes the actions it will take to fulfill its obligations under this Agreement.

121. For the first year after the effective date, the Parties shall meet quarterly to discuss the status of compliance.

122. Beginning the second year after the effective date, the parties will meet semiannually to discuss the status of compliance and to discuss the next Implementation Plan.

123. Within four months of the effective date, DJJ will provide the first Implementation Plan ("Implementation Plan #1") to the United States.  In this Implementation Plan (and successive Implementation Plans), DJJ will develop a specific schedule and deadlines for the upcoming year and a general schedule for successive years.

124. The United States and the Subject Matter Expert will provide comments regarding Implementation Plan #1 (and any further Implementation Plans) within 30 days of receipt.  DJJ will timely consider comments from the United States and any comments from the Subject

Matter Expert; the Parties and the Subject Matter Expert will meet and consult as necessary. Implementation Plans must be approved by the United States.

125. Annually, DJJ, following the procedures in paragraphs 123–124, will supplement Implementation Plan #1 with further Implementation Plans (#2, #3, *etc.*) with a focus on the implementation activities anticipated over the coming year. DJJ will address in its further Implementation Plans any recommendations identified by the Subject Matter Expert or by the United States.

126. DJJ will make a summary of the Implementation Plan publicly available, including by posting a summary of the Plan on the DJJ website.

### vi.     ENFORCEMENT AND TERMINATION

127. The United States will file a Complaint in the District Court for the District of South Carolina, based upon the February 2020 and April 2022 Notices. The Parties agree simultaneously to file this Agreement as an exhibit to a joint motion to dismiss the United States' Complaint, pursuant to Fed. R. Civ. P. 41(a)(2), subject to reinstatement upon the United States' motion for the purpose of resolving a claim that DJJ materially breached any provision of the Agreement. The motion to dismiss the Complaint shall request that the Court retain jurisdiction to resolve any dispute under the Agreement.

128. Should the United States move to restore the Complaint to the active docket of the Court for purposes of resolution of a claim of breach, DJJ consents to and agrees not to contest the United States' motion to restore.

129. If the Action is reinstated, DJJ expressly agrees not to count the time during which this Agreement is in place, or use the terms or existence of this Agreement, to plead, argue or otherwise raise any defenses under theories of claim preclusion, issue preclusion, statute of limitations, estoppel, laches, or similar defenses.

130. Before moving to restore the Complaint to the active docket, the United States will provide DJJ notice of any asserted breach in writing, and shall engage in good faith discussions in an effort to resolve the dispute. For conditions or practices that pose an immediate and serious threat to the life, health, or safety of youth, DJJ will have seven days from the date of notice to cure the default. For all other conditions or practices, DJJ will have up to 60 days from the date of notice to cure the default. The notice will be sent by email to the Agreement's signatories or their successors.

131. In the event the United States reinstates the Action and the Court finds a material breach of the Agreement, the United States may seek the following: (1) an order mandating specific performance of any term or provision in this Agreement; or (2) an order entering this Agreement as an order of the Court and enforceable by the Court; and (3) any additional relief that may be authorized by law or equity.

132. Except where otherwise agreed to under a specific provision of this Agreement, DJJ will implement all provisions of this Agreement within four years of the effective date.

133. This Agreement shall terminate in five years, if the Parties agree that DJJ has attained substantial compliance with all provisions and maintained that compliance for one year. "Substantial compliance" means that DJJ has achieved compliance with the material components and has met the goals of the relevant provision of the Agreement. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of sustained non-compliance will not constitute substantial compliance.

134. DJJ may seek termination of any full substantive section in Roman numeral III (*i.e.*, the small capitalized sections identified as "PROTECTION FROM HARM," "ISOLATION," "TRAINING," and "QUALITY ASSURANCE") by filing with the Court a motion to terminate that section. The burden will be on DJJ to demonstrate that BRRC has attained and maintained its substantial compliance as to that section for at least one year.

135. Regardless of this Agreement's specific requirements, this Agreement will terminate, or substantive sections as described in paragraph 134 may terminate, upon a showing by DJJ that it has come into durable compliance with the requirements of the Constitution that gave rise to this Agreement. In order to demonstrate durable compliance, DJJ must establish with the Court that BRRC is operating in accordance with constitutional conditions of confinement related to adequate protection from harm and isolation for youth at BRRC and has been doing so continuously for one year.

136. In any dispute regarding compliance with any provision of this Agreement, DJJ will bear the burden of demonstrating that it is in substantial compliance. Either Party may seek a ruling by the Court to as DJJ's compliance.

137. The Parties agree to work collaboratively to achieve the purpose of this Agreement. In the event of any dispute over the language, requirements, or construction of this Agreement, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution.

138. Any modification of this Agreement will be executed in writing by the Parties before becoming effective.

139. The United States and DJJ will each bear the cost of their own fees and expenses incurred in connection with this case.

### vii.     GENERAL PROVISIONS

140. This Agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of DJJ to implement the terms of this Agreement.

141. The Parties agree that, as of the effective date of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described in this Agreement. To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

142. DJJ will not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation or the Subject Matter Expert's activities related to this Agreement. DJJ will timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and take any necessary corrective actions identified through such investigations.

143. Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Agreement.

144. The Parties will promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof.

145. The Parties represent and acknowledge this Agreement is the result of extensive, thorough, and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in DOJ's February 2020 and April 2022 notices. Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement. DJJ represents and warrants that it is authorized by state law to bind the State of South Carolina to the terms and conditions of this Agreement and has received the approval of the South Carolina State Fiscal Accountability Authority as required by South Carolina Code Annotated, Section 11-1-45(a).

146. This Agreement may be executed in counterparts, each of which will be deemed an original, and the counterparts will together constitute one and the same Agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

147. The performance of this Agreement will begin immediately upon the effective date.

148. DJJ will maintain sufficient records and data to document that the requirements of this Agreement are being properly implemented and will make such records available to the Subject Matter Expert and the United States for inspection and copying on a reasonable basis. Such action is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Subject Matter Expert will hold such information in strict confidence to the greatest extent possible.

FOR THE UNITED STATES:

COREY F. ELLIS
United States Attorney
District of South Carolina

JAMES LEVENTIS
Civil Chief

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief

WINSOME G. GAYLE
DEENA FOX
Deputy Chiefs
Special Litigation Section

ROBERT SNEED
Assistant United States Attorney
U.S. Attorney's Office
District of South Carolina
55 Beattie Place, Ste. 700
Tel: (864) 282-2100
rsneed@usa.doj.gov

RYAN C. WILSON (DC Bar No. 1013907)
ROBYN K. BITNER (NY Bar No. 5294970)
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 598-9599
Fax: (202) 514-4883
ryan.wilson@usdoj.gov
robyn.bitner@usdoj.gov

Dated: April 13, 2022

FOR THE SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE:

_L. Eden H. Hendrick_
L. EDEN HENDRICK
Interim Executive Director
South Carolina Department of Juvenile Justice
4900 Broad River Road
Columbia, SC  29212
Tel: 803-896-9749

Dated: 4/13/2022